**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SPARACINO PLLC
1920 L Street, N.W., Suite 535
Washington, D.C. 20036,

     Plaintiff,

   v.

U.S. DEPARTMENT OF STATE
The Executive Office
Office of the Legal Adviser, Suite 5.600
600 19th Street N.W.
Washington, D.C. 20522,

     Defendant.

Case No.: _____

**COMPLAINT FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT**

## INTRODUCTION

1.     Plaintiff Sparacino PLLC represents hundreds of U.S. citizens who were injured, or whose loved ones were killed or injured, by terrorist attacks in Iraq, including American military veterans and Gold Star families.  Plaintiff brings this action for relief under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the United States Department of State (the "Department") to produce records related to corrupt payments that helped fund the terrorist attacks that injured Plaintiff's clients.

2.     Between November 2017 and March 2019, Plaintiff submitted eight targeted FOIA requests to the Department.  For five of those eight requests, the Department has neither produced any documents nor made a determination, and its statutory deadline for doing so expired long ago.  For the other three requests, after many months of delay, the Department produced some records but made no determination about many of the documents Plaintiff requested, failed to conduct adequate searches, and improperly withheld materials based on unsupportable exemption claims.  When Plaintiff administratively appealed these FOIA violations, the Department failed to respond and missed its statutory deadlines again.

3.     More than a decade ago, the President directed federal agencies to adopt a "presumption in favor of disclosure" and to respond to FOIA requests "promptly and in a spirit of cooperation," so that "openness prevails."  FOIA Pres. Mem., 74 Fed. Reg. 4683, 4683 (Jan. 21, 2009).  In responding to Plaintiff's requests, the Department has disregarded that directive. Plaintiff has been more than patient in waiting for the Department to respond to its requests:  it has bent over backwards to engage with the Department, checked in on the status of its requests repeatedly, consented to multiple extensions, and attempted to assist the Department by identifying narrow search terms and specifying relevant document custodians.  The Department,

by contrast, has ignored correspondence, blown deadlines, and cited a rotating litany of excuses (ranging from multiple vacations to allegedly moldy warehouses) that are inconsistent with its disclosure obligations.  Simply put, Plaintiff has requested documents on behalf of Gold Star families and wounded soldiers who served their country with distinction, and the Department has all but ignored them.  Having exhausted all administrative and practical remedies, Plaintiff seeks an order compelling prompt productions.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

5.      Venue lies in this District pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

**PARTIES**

6.      Plaintiff Sparacino PLLC is a law firm with offices in Washington, D.C. Sparacino personnel submitted each of the FOIA requests identified in this Complaint and, with the undersigned co-counsel, engaged in the follow-up efforts detailed below.

7.      Defendant United States Department of State is an agency of the federal government within the meaning of 5 U.S.C. § 552(f)(1).  The Department is believed to have possession, custody, and control of records responsive to Plaintiff's requests.

**FACTUAL ALLEGATIONS**

I.      **Plaintiff Represents Victims of Terrorist Attacks in Iraq**

8.      Plaintiff and its undersigned co-counsel represent more than 1200 U.S. citizens who were killed or injured, or whose relatives were killed or injured, by the Shiite terrorist group Jaysh al-Mahdi in Iraq between 2005 and 2011.  These victims of heinous terrorist attacks have

asserted claims in this District against large medical-supply companies that helped finance Jaysh al-Mahdi's terrorist acts by, among other things, making corrupt payments to obtain contracts from the Jaysh al-Mahdi-controlled Iraqi Ministry of Health (the "Ministry").  *See* Second Am. Compl., *Atchley, et al. v. AstraZeneca UK Limited, et al.*, No. 17-cv-02136-RJL (D.D.C. Feb. 4, 2019), Dkt. 106.

9.      Plaintiff submitted the FOIA requests at issue to obtain Department records relevant to issues raised in *Atchley*, including documents analyzing corruption within the Ministry and the Ministry's import subsidiary, Kimadia, and Jaysh al-Mahdi's activities within the Ministry and throughout Iraq.

10.      Further, the defendants in *Atchley* have asserted that the U.S. government *wanted* them to transact with the terrorists within the Ministry, citing documents supposedly authored by the Department, among other sources.  *See* Mem. in Supp. Defs.' Mots. to Dismiss at 8-15, *Atchley*, No. 17-cv-02136 (Apr. 4, 2019), Dkt. 111-1.  Plaintiff's FOIA requests seek (among other things) records potentially relevant to this assertion.

11.      The requested records have broader public significance beyond the *Atchley* litigation.  National media has reported on the *Atchley* plaintiffs — many of whom are Gold Star families and wounded military veterans, and all of whom made great sacrifices for our country — reflecting the public's interest in allegations that large corporations financed terrorism in Iraq.[1]  Further reflecting the public importance of these allegations, the Department of Justice

---

[1] *See, e.g.*, Gardiner Harris, *Lawsuit Claims Three U.S. Companies Funded Terror in Iraq*, N.Y. Times (Oct. 17, 2017); Kyle Swenson, *Lawsuit:  Big Pharma Funded Terrorism in Iraq with Payments to Corrupt Health Ministry*, Wash. Post (Oct. 19, 2017).

("DOJ") is reportedly investigating the *Atchley* defendants' corrupt dealings in Iraq,[2] as those

defendants have publicly acknowledged.[3]

## II.    Plaintiff Submitted Eight FOIA Requests for Department Records

12.    Plaintiff properly submitted eight separate requests for records to the Department

via the mail and email addresses specified in Department FOIA regulations.  *See* 5 U.S.C.

§ 552(a)(3)(A); 22 C.F.R. § 171.4.  Each request "reasonably describes" the records Plaintiff

seeks, 5 U.S.C. § 552(a)(3)(A)(i), and, to the extent possible, specifies documents, authors, dates,

and corroborating information establishing the existence of the requested records.  The requests

are summarized in the following eight paragraphs and attached in full as Exhibits 1 through 8.

13.    *Plaintiff's First Request*.  Request F-2017-17610 seeks sixteen specified

"telegrams, or 'cables,' sent and/or received by officials representing the U.S. Department of

State and/or its organizational components" related to issues in *Atchley*, such as corruption in

Iraq and Jaysh al-Mahdi.  Ex. 1 at 1-2 (Request F-2017-17610 (Nov. 30, 2017)).  All sixteen

---

[2] *See*, *e.g.*, Gardiner Harris, *Justice Dept. Investigating Claims that Drug Companies Funded Terrorism in Iraq*, N.Y. Times (July 31, 2018).

[3] Three of the five named corporate-family *Atchley* defendants, AstraZeneca, Johnson & Johnson, and Pfizer, disclosed the DOJ investigation in SEC filings.  *See* AstraZeneca PLC, Report of Foreign Issuer (Form 6-K) at 58 (July 26, 2018) (stating that it "received an inquiry from the US Department of Justice in connection with an anti-corruption investigation relating to activities in Iraq, including interactions with the Iraqi government and certain of the same matters alleged in the [*Atchley*] Lawsuit"); Johnson & Johnson, Quarterly Report (Form 10-Q) at 40-41 (Aug. 2, 2018) ("Also, the company has received an inquiry from the United States Department of Justice regarding the matters set out in the [*Atchley*] complaint."); Pfizer Inc., Quarterly Report (Form 10-Q) at 44 (Aug. 9, 2018) (stating that, "[i]n July 2018, the U.S. Department of Justice requested documents related to [the *Atchley*] matter, which we will be providing"; and noting "government investigations related to contracts with the Iraqi Ministry of Health").  Another defendant, Roche, confirmed to the press that it "received an inquiry from and is cooperating with the Department of Justice on this matter."  Angus Liu, *Roche, Johnson & Johnson Pulled into Justice Department Probe of Alleged Terrorist Bribes*, FiercePharma (Aug. 2, 2018), https://www.fiercepharma.com/pharma/roche-johnson-johnson-also-under-justice-department-probe-alleged-terrorist-bribes.

requested documents are identified by date, cable number, and subject.  *See id.*  The request

further seeks a report and a diplomatic communication, both specified by title and date or date

range, with citations to *New York Times* articles referencing each requested document.  *See id.*

14.     *Plaintiff's Second Request.*  Request F-2018-00003 seeks all records "authored by

members of:  a) the Iraq Reconstruction Management Office ('IRMO') Office of Accountability

and Transparency ('OAT') of the U.S. Embassy in Iraq; or b) OAT's successor, the Anti-

Corruption Coordination Office (ACCO), concerning" eight specified entities or individuals,

within a specified time period related to issues raised in *Atchley*, including the Ministry and

Jaysh al-Mahdi.  Ex. 2 at 1 (Request F-2018-00003 (Dec. 20, 2017)).  The request specifically

identifies, as examples, five responsive documents.  *See id.* at 2.

15.     *Plaintiff's Third Request.*  Request F-2018-00010 seeks all records concerning the

same eight entities and/or individuals specified in Plaintiff's second request that were "authored

by:  a) the International Criminal Investigative Training Assistance Program (ICITAP), or its

members (dated from January 1, 2005 to December 31, 2008); or b) the Office of the Health

Attaché, Deputy Health Attaché, or the Acting Health Attaché of the U.S. Embassy in Iraq, or

any members of the foregoing (dated from June 1, 2004 to December 31, 2009); or c) the Office

of the Special Inspector General for Iraq Reconstruction (SIGIR) (dated from June 1, 2004 to

December 31, 2009)."  Ex. 3 at 1 (Request F-2018-00010 (Dec. 20, 2017)).

16.     *Plaintiff's Fourth Request.*  Request F-2018-00011 seeks correspondence with,

documents produced to, and documents and communications relating to Department employees'

testimony or interviews before the House Committee on Oversight and Government Reform in

connection with the Committee's "investigation into corruption in Iraq," within a specified 18-

month time period.  Ex. 4 at 1 (Request F-2018-00011 (Dec. 20, 2017)).  The request specifies,

by way of example, four Department officials by name.  *See id.*  This request also seeks any

study, report, or publication within a specified four-year period authored by "ProCare Services or

The International Drug Dispensary . . . concerning Kimadia."  *Id.*  Documents obtained from the

Department of Health and Human Services confirm that ProCare Services (a Canadian

consulting firm) evaluated Kimadia in a lengthy, formal study and delivered its findings to the

Department and others.

      17.    *Plaintiff's Fifth Request.*  Request F-2018-02824 seeks five specified "telegrams,

or 'cables,' sent and/or received by officials representing the U.S. Department of State and/or its

organizational components" relevant to issues raised in the *Atchley* litigation, including U.S.

efforts to address the threat to American interests posed by Muqtada al-Sadr, the leader of Jaysh

al-Mahdi.  Ex. 5 at 1 (Request F-2018-02824 (Apr. 3, 2018)).  Each of the five requested

documents is identified by date, cable number, and subject.  *See id.*

      18.    *Plaintiff's Sixth Request.*  Request F-2019-01492 seeks three "telegrams, or

'cables,' sent and/or received by officials representing the U.S. Department of State and/or its

organizational components" relevant to issues raised in the *Atchley* litigation.  Ex. 6 at 1

(Request F-2019-01492 (Nov. 7, 2018)).  Each of the three requested documents is identified by

date, cable number, and subject.  *See id.*

      19.    *Plaintiff's Seventh Request*.  Request F-2019-03694 seeks three additional

"telegrams, or 'cables,' sent and/or received by officials representing the U.S. Department of

State and/or its organizational components" relevant to issues raised in the *Atchley* litigation.  Ex.

7 at 1 (Request F-2019-03694 (Feb. 12, 2019)).  Again, each of the three requested documents is

identified by date, cable number, and subject.  *See id.*

20.     *Plaintiff's Eighth Request.*  Request F-2019-04415 seeks "[c]omplete copies of all diplomatic telegrams, cables, 'record e-mails,' and similar electronic communications concerning Iraq and/or Baghdad, sent or received by anyone representing the U.S. Department of State and/or its organizational components found using *either* of" two Boolean searches designed to capture topics relevant to the *Atchley* litigation.  Ex. 8 at 2 (Request F-2019-04415 (Mar. 5, 2019)).  The Department's FOIA Branch Chief had previously informed Plaintiff that the Department maintains diplomatic cables in a text-searchable repository and that such searches are possible.  *See id.* at 1-2.

21.     Several weeks (or in some cases months) after each request was delivered, the Department acknowledged receipt, assigned a tracking number, and identified the date each request was received by the Department, as set forth in the table below.

| Request Date | Request Number | Date of Receipt[4] | Date of Acknowledgment |
|---|---|---|---|
| 11/30/2017 | F-2017-17610 | 12/06/2017 | 12/19/2017 |
| 12/20/2017 | F-2018-00003 | 12/27/2017 | 01/16/2018 |
| 12/20/2017 | F-2018-00010 | 12/27/2017 | 01/16/2018 |
| 12/20/2017 | F-2018-00011 | 12/27/2017 | 01/16/2018 |
| 04/03/2018 | F-2018-02824 | 04/11/2018 | 06/27/2018 |
| 11/07/2018 | F-2019-01492 | 11/20/2018 | 01/28/2019 |
| 02/12/2019 | F-2019-03694 | 02/27/2019 | 03/12/2019[5] |
| 03/05/2019 | F-2019-04415 | 03/25/2019 | 04/04/2019[6] |

---

[4] The Department "receives" a request when "the appropriate component" receives it, or 10 business days after any agency FOIA office receives it.  5 U.S.C. § 552(a)(6)(A)(ii); 22 C.F.R. § 171.11(e).

[5] Because the Department had not acknowledged this request, Plaintiff contacted the Department's FOIA hotline on March 12, 2019, and was told the request arrived on February 27.

[6] Plaintiff sent this request via certified mail, and USPS tracking confirms the Department received it on March 11, 2019.  Because the Department had not acknowledged this request, Plaintiff's co-counsel contacted the Department's FOIA hotline on April 4, 2019, and was told the request was logged into the Department's system on March 25, the date on which it would have been legally deemed received in any event, *see* 22 C.F.R. § 171.11(e).  Plaintiff resubmitted

22.     The Department's written acknowledgments were substantially similar, stating the subject of the request, the date the request was received, and the tracking number assigned to the request.  One acknowledgment states that the request (F-2018-02824) had been placed in the "complex category," and another states that the request (F-2019-01492) had been placed in the "simple category," while the other acknowledgments do not specify such a category.

23.     Several of the acknowledgments assert that "[u]nusual circumstances . . . *may* arise that would require additional time to process your request," but none of the acknowledgments referred to any specific unusual circumstances, asserted that such circumstances actually existed, or requested additional processing time.  Several of the acknowledgments also state that the Department has adopted a first-in/first-out policy and that requests will be processed chronologically, though none of the acknowledgments estimated when processing would be complete.

24.     None of the acknowledgments asserted that the requests were deficient or that the requested records were inadequately described.  And none of the acknowledgments sought more information from Plaintiff to facilitate searches and production.  To the extent the Department belatedly requested information about some of Plaintiff's requests, Plaintiff promptly provided it.  *See infra* Part III.C.

---

this request via the Department's website but does not pursue that additional claim now that the Department has at last acknowledged the initial request.

**III.    The Department Failed Make a Determination As to Six of Plaintiff's Requests and Failed to Conduct Timely and Reasonable Searches**

**A.    The Department Violated FOIA's Time Limits and Search Requirements**

25.    Pursuant to 5 U.S.C. § 552(a)(3)(A), after receiving Plaintiff's requests, the Department was required to search for responsive records, including making reasonable efforts to search for records in electronic format, and to promptly produce the records it located. Further, pursuant to 5 U.S.C. § 552(a)(6)(A)(i), the Department was required to make a determination within 20 working days of receiving each FOIA request — that is, within 20 working days of the "Date of Receipt" listed for each request in the table above.  Thus, the Department was required to complete searches and make determinations by January 5, 2018, for the first request, and by April 22, 2019, for the last.[7]

26.    To date, the Department has made *no determination or production* in response to five of Plaintiff's requests:  F-2018-00003, F-2018-00010, F-2019-01492, F-2019-03694, and F-2019-04415.  The Department's failure to make determinations concerning those requests, some of which are more than 16-months old, violates 5 U.S.C. § 552(a)(6)(A)(i).  The Court should therefore compel the Department to promptly conduct (or complete) reasonable searches, make determinations, and produce responsive, non-exempt documents.

27.    The Department has also failed to make determinations and productions in response to significant portions of a sixth request:  F-2018-00011.  Specifically, while the Department produced some documents related to the House Oversight Committee's 2007

---

[7] Section 552(a)(6)(A) allows the Department to make one request for more information and tolls § 552(a)(6)(A)(i)'s time limit while the Department awaits a response, and § 552(a)(6)(B)(i) permits one 10-working-day extension in "unusual circumstances."  As noted in ¶¶ 23-24, the Department has not invoked either of these provisions.  Regardless, any such extension would by now be expired.

investigation into Iraqi corruption, it failed to make a determination as to other documents related to that investigation, including subpoenas the Committee issued to the Department, documents the Department submitted to the Committee, and transcripts of any interviews the Committee conducted of Department personnel.  The Department also failed to make a determination as to documents related to ProCare Services's report on Kimadia.

28.     Plaintiff informed the Department of these failures to address Request F-2018-00011 and its basis for believing the Department had responsive records via email on November 21, 2018, and January 22, 2019.  The Department eventually responded, explaining on February 8, 2019, that "[s]earches are in progress" for the omitted documents responsive to Request F-2018-00011.[8]  Despite representing that searches were in progress several months ago, the Department has not provided any further updates and therefore has not made a determination as to these aspects of Plaintiff's request, long after the deadline in 5 U.S.C. § 552(a)(6)(A)(i) expired.  The Court should therefore compel the Department to expeditiously complete adequate searches and production of additional records responsive to Request F-2018-00011.

**B.     Plaintiff Has Constructively Exhausted Administrative Remedies**

29.     For each of the foregoing requests (or aspects thereof), the Department has not stated which documents will be produced and withheld, provided reasons for any withholding, or informed Plaintiff of appellate rights.  The Department thus has not made a determination.

30.     As stated above, § 552(a)(6)(A)(i)'s 20-working-day time limit has expired for each request at issue, and Plaintiff is therefore "deemed to have exhausted [] administrative

---

[8] The Department also confirmed on February 13, in the same email chain, that where it made a partial determination and production but was continuing to process other aspects of the same request, any appeal from the determination only needed to include documents within the scope of the determination and did not need to include documents the Department was still processing.

remedies" with respect to the foregoing FOIA violations. *id.* § 552(a)(6)(C)(i). *See also infra*

¶ 35 (Department confirming that appealing is unnecessary to exhaust).

### C.    The Department Has Disregarded Its Directive to Act Promptly and Cooperatively and Is Frustrating FOIA's Purposes

31.    In violating FOIA's time limits (in some cases by more than a year) and denying

Plaintiff access to the documents it requested, the Department has shown an alarming lack of

diligence.

32.    The Department's delays began at intake.  In some instances, it took the

Department two-and-a-half months to send a simple acknowledgment letter.  For example, the

Department admits it received Request F-2018-02824 on April 11, 2018 but did not send

Plaintiff an acknowledgment until June 27, 2018.

33.    The Department further delayed by ignoring Plaintiff's requests for updates.  For

example, several months after submitting requests in November and December 2017, *see* Exs. 1-

4, on February 21, 2018, Sparacino partner Sarah Allen emailed the Department seeking updates

and offering to answer "any questions about these requests that we can help to clear up."  More

than a month passed without a response, and on April 10, 2018, Sparacino partner Patrick

McMullen called the Department's FOIA office and left a voicemail.  Although the outgoing

message indicated that the Department would return Mr. McMullen's call within 24 hours, there

was no response.

34.    Plaintiff then submitted an administrative appeal on April 13, 2018, challenging

the Department's failure to comply with FOIA's timelines.  The appeal reiterated Plaintiff's

offer to work with the Department to efficiently process the requests.

35.    On April 18, 2018, the Department responded to the appeal by confirming that the

requests were "still being processed," and that "the lack of a substantive response to date is not

the same as a response indicating that no documents were found." Ex. 9 (Dep't Appeal

Response (Apr. 18, 2018)). The Department further informed Plaintiff that, "since no specific

material has been denied," Plaintiff's "FOIA requests are not subject to administrative appeal at

this time." *Id.*

The Department explained, however, that Plaintiff had constructively exhausted administrative

remedies and did not need to appeal:

> Section (a)(6)(C) of the FOIA provides that a requester shall be deemed to have
> exhausted his administrative remedies if an agency fails to respond within the
> applicable time limit specified in the paragraph, which is twenty days (with
> certain exceptions). The requester, therefore, would not be required to appeal
> administratively before instituting suit in federal court.

*Id.*[9]

36.     Hoping to avoid litigation, and in a further attempt to accommodate the

Department, on May 23, 2018, Plaintiff sought assistance with its first four requests from the

federal FOIA ombudsman, the Office of Government Information Services ("OGIS"). Plaintiff

waited more than two months for a response from OGIS, which came on July 26, 2018. *See* Ex.

10 at 1 (Ltr. from OGIS to P. McMullen (July 26, 2018)). OGIS informed Plaintiff that it had

communicated with the Department's FOIA Public Liaison, who estimated that the Department

would complete processing Plaintiff's first four requests by July 31, 2018. *See id.* at 2. At the

time, July 31 was only five days away, and OGIS's communication thus suggested that the

---

[9] On June 22, 2018, Plaintiff also appealed the Department's failure to make a timely
determination on Request F-2018-02824. That appeal and the Department's response, dated July
5, 2018, are substantially similar to the appeal and response concerning Plaintiff's first four
requests. Plaintiff did not appeal the Department's failure to make timely determinations
concerning Requests F-2019-01492, F-2019-03694, or F-2019-04415, because the Department
made clear that it will not address violations of FOIA's determination deadline through
administrative appeals, and appealing is unnecessary to exhaust administrative remedies under
§ 552(a)(6)(C)(i).

Department's processing was nearly complete.  OGIS also reiterated that Plaintiff had

constructively exhausted administrative remedies and had an immediate right to judicial review

but suggested that Plaintiff should follow up with OGIS and/or the Department directly absent a

"response by mid-September 2018." *Id.*

37.     July 31, 2018 passed without any update from the Department, let alone a

determination or production.  Plaintiff then requested updates and sought estimated dates of

completion from the Public Liaison on multiple occasions.  Receiving no response, Plaintiff

reached out to OGIS for assistance once again.  The Public Liaison eventually responded on

August 30, 2018 — a month after the Department estimated it would be done "processing"

Plaintiff's requests.  The response did not, however, provide a determination or an estimated

date of completion.  Ms. Robinson explained only that she was "working to obtain the necessary

information regarding the processing of the cases, as I have to consult with staff from other

offices prior to responding to you."

38.     Early the next week, on September 4, 2018, Mr. McMullen emailed the Public

Liaison seeking estimated dates of completion for Plaintiff's fifth FOIA request (among others

not at issue in this Complaint).  Mr. McMullen received an automated response stating that the

Public Liaison would be out of the office until September 17, 2018.  The email instructed:  "If

you require immediate assistance regarding a FOIA matter, please forward an email to . . .

foiaprogram-dl@state.gov."

39.     Mr. McMullen did as instructed but did not receive a response.

40.     On September 11, 2018, Plaintiff sent the Department a formal letter reiterating

Plaintiff's request for a substantive response or, at a minimum, estimated dates of completion.

The letter explained that Plaintiff intended to sue if the Department did not provide a reasonable and firm estimated date of completion by September 26, 2018.

41.     Plaintiff's request was intentionally modest and accommodating.  Though the Department was already months too late to comply with FOIA and had already missed its own belated date for processing Plaintiff's requests, Plaintiff demanded only an estimated date of completion (not a production).  Plaintiff also accommodated the Public Liaison's leave by requesting that an estimate be provided after her return, which delayed the issue beyond OGIS's suggested "mid-September" timeframe for following up.

42.     To ensure that the Department had received Plaintiff's letter, Mr. McMullen called and emailed the Public Liaison on September 21, 2018, after her expected return.  Mr. McMullen received an automated response stating that she would be out of the office again until September 26, 2018.  Mr. McMullen promptly called one of her colleagues, who instructed Mr. McMullen to resend Plaintiff's letter to the Department's general FOIA mailbox.  This colleague confirmed receipt of Plaintiff's letter, explained that he escalated the issue to his supervisor, and said that Plaintiff should receive a response "soon."

43.     On September 25, 2018, the day before Plaintiff stated it intended to sue absent reasonable and firm estimates, another individual from the Department's FOIA office called Mr. McMullen requesting that Plaintiff refrain from filing suit until October 1.  Plaintiff again agreed to accommodate the Department.

44.     On October 1, 2018, the Department, via a FOIA Branch Chief,[10] called Mr. McMullen and informed him that it would send an email with updates on each request that day

---

[10] Unless otherwise noted, correspondence with the Department described in the remainder of Part III was with this same FOIA Branch Chief.

or the next.  The Department further informed Mr. McMullen that it would complete its

production of cables for Requests F-2017-17610 and F-2018-02824 by the end of October.  With

respect to Requests F-2018-00003 and F-2018-00010, the Department explained that the relevant

bureaus had found no responsive documents in current files, and that the next step was to search

archived, retired records.  The Department estimated that productions would be complete within

the next two to three months — in other words, by December 2018.

      45.    The Department then sent Mr. McMullen an email on October 1 and another

email on October 2, 2018, that contemplated even more delay than had been described on the

phone:

- F-2017-17610 (Ex. 1):  "The request is only pending a search for cables which can be done in-house and should be completed shortly."  The Estimated Date of Completion ("EDC") "is November 2018."

- F-2018-00003 (Ex. 2):  "[T]his request is pending a search for cables and retired records, both of which can be done in-house.  The EDC is December 2018, but I will update you once we determine the volume of documents.  Regardless, we will provide information to you on a rolling release so you can expect some documents before December 2018."

- F-2018-00010 (Ex. 3):  Same as Request F-2018-00003.

- F-2018-00011 (Ex. 4):  "There are cables and some documents that are ready for review.  I will assign these records to a reviewer and try to get something to you by the end of this month or beginning of November. . . . As I will be on leave next week [through October 15], I can update you regarding the results of the retired records search upon my return."

- F-2018-02824 (Ex. 5):  "This is a request for five cables and the search should be completed by the end of the week.  Once the documents are in our system, they will be assigned to a reviewer.  EDC is November 2018."

      46.    Plaintiff yet again accommodated the Department's delay and refrained from

filing suit given the Department's representations that rolling productions would begin by late

October or early November 2018.

47.     On October 16, 2018, the Department informed Mr. McMullen that the

Department was on schedule to produce the requested cables by the end of October, and might

be able to produce them during the week of October 22-26.  Two days later, the Department

reiterated during a phone call with Mr. McMullen and co-counsel that cables responsive to

Requests F-2017-17610 and F-2018-02824 should be produced during the next week, or at worst

by the end of October.

48.     During this same call, however, the Department also stated that productions of

archived documents might be further delayed because the building in which they were stored was

closed for an extended period of time to allow for mold abatement.  The Department still

anticipated productions from archived records in December 2018.

49.     Despite Plaintiff's patience and the Department's assurances, no documents were

produced during October 2018.  On October 31, the Department informed Mr. McMullen via

telephone that production of the cables would be further delayed for a new reason:  the

Department of Defense might have to approve the release of certain documents.  The Department

stated that the documents would now be ready for delivery early the week of November 5, 2018.

50.     On November 6, 2018, the Department informed Mr. McMullen via telephone

that production of the cables was again delayed for yet another new reason:  while certain cables

were past their declassification date and were by now more than a decade old, the Department

was considering reclassifying them, and the employee responsible for making this decision was

out on paternity leave.

51.     On November 8, 2018, the Department informed Mr. McMullen via email that

one of the five cables requested in F-2018-02824 "should be ready for release (with minor

redactions),” but because the FOIA Branch Chief “will be out of the office tomorrow [Friday,

November 9],” the cable will not be produced until “Tuesday morning [November 13].”

52.     On November 13, Plaintiff finally received one redacted cable responsive to F-

2018-02824.  During November, the Department produced four more cables responsive to F-

2018-02824 and also made partial productions in response to F-2017-17610 and F-2018-00011

— albeit with significant and unjustified redactions which separately violate FOIA, as discussed

in Part IV below.  But the Department made no determination or production at all in response to

significant portions of F-2018-00011.  The Department also omitted two cables that were

specifically requested in F-2017-17610, and it made no determination or production at all for

Plaintiff’s other requests.

53.     Plaintiff continued working with the Department to correct these ongoing FOIA

violations.  Regarding the two missing cables referenced in F-2017-17610 (Ex. 1), after several

follow-up requests, on February 8, 2019, the Department explained that it “d[id]n’t know why

these [two cables] were missed the first time around but we were able to pull them,” and the

Department said it would “assign one of our reviewers [to] take a look at these on Monday

[February 11].”  The Department eventually produced those two cables on March 27, 2019, but

with heavy and improper redactions as discussed in Part IV below.

54.     Regarding the House Oversight Committee and ProCare Services documents

referenced in Request F-2018-00011 (Ex. 4), on February 8, 2019, the Department informed Mr.

McMullen only that “[s]earches are in progress.”  At the time of that assertion, Plaintiff’s request

had been pending with the Department for more than thirteen months.  In the three months since,

the Department has not provided even an update, let alone a production or determination.

55.     Regarding F-2018-00003 and F-2018-00010, on November 14, 2018, after the Department informed Plaintiff that it was possible to run electronic searches for certain Department records, including cables, Mr. McMullen sent a targeted list of names and other terms to run through the cable search engine, designed to efficiently capture responsive documents.[11]

56.     In addition to submitting search terms to locate cables, based on suggestions received from Department personnel in phone calls on December 18 and 20, 2018, Plaintiff painstakingly reviewed publicly available documents to help the Department locate non-cable documents by identifying:  (a) names of individuals who likely retained relevant records, whom the Department had previously identified only by position; (b) specific citations to examples of responsive documents that passed through those custodians; (c) a link to an example of a publicly available responsive record; (d) a list of TAGS — which the Department uses to organize its files — likely to generate responsive records; and (e) a list of relevant Department employees at the U.S. Embassy in Baghdad that likely would have generated and/or maintained responsive records.

57.     Plaintiff provided this information to the Department on January 22, 2019, and in the same email reminded the Department that "we still have received zero responsive documents . . . despite our many months of asking."  Mr. McMullen noted that he had proposed in a December 18, 2018 phone call that the Department produce whatever documents had been found

---

[11] Specifically, Mr. McMullen proposed searching for six Department officials and searching for cables with a variant of Ministry of Health or Kimadia AND a variant of one of ten possible terms.  Mr. McMullen's email clearly contemplated that the Department should use the terms to identify documents responsive to "any of our requests," but the terms are facially most pertinent to F-2018-00003 and F-2018-00010.

to date, even if that was a small production, as a sign of good faith (and consistent with the Department's estimate that productions should begin by December 2018).

58.     The Department did not make such a good-faith production in December 2018, and when it responded to Plaintiff's email on February 8, 2019, the Department offered only that it hoped to "get documents to you as quickly as possible" and explained that a Department employee had searched several boxes and located "potentially responsive material."  The Department further explained that it was still "waiting for additional boxes . . . but we are working to get documents scanned and reviewed as soon as possible.  We will provide you an update on the approximate number of documents *next week* [*i.e.*, the week of February 11, 2019]."

59.     It is now approximately three months later, and the Department has not provided an update, let alone a production.  It is not even clear that the Department has taken the minimal step of running the electronic search terms that Plaintiff proposed in November 2018 or employing the search parameters and TAGS that Plaintiff proposed in January 2019.

60.     To the contrary, it appears such searches have not been conducted.  On February 19, 2019, Mr. McMullen asked the Department to confirm that the Department had run the search terms proposed in November 2018.  Mr. McMullen followed up again on February 22, but the Department has not replied.  The Department's broken promises, unwillingness to produce potentially responsive documents it supposedly located months ago, apparent failure to implement search parameters it suggested that Plaintiff provide, and general unresponsiveness flout the spirit of openness and cooperation that should prevail under FOIA.

61.     The Department has similarly failed to make a timely production or determination in response to any of Plaintiff's three more recent requests (Exs. 6-8).  Plaintiff is bringing suit

to compel a determination and production as to these three requests now, to avoid repeating its experience of spending months accommodating the Department only to be forced into litigation anyway by unjustifiable delays and redactions.

62.     In sum, for all or portions of six requests, the Department has not completed its searches, communicated its determinations, and/or produced documents.  The Department has disregarded not only statutory deadlines but also has repeatedly missed its own internal estimates of July 31, 2018 (to complete "processing," *see* ¶¶ 36-37), the end of October (for a partial production, *see* ¶¶ 44-45, 47), early in the week of November 5 (for a partial production, *see* ¶ 49), the end of November (to complete productions in response to F-2017-17610, *see* ¶ 45), December 2018 (for partial productions in response to F-2018-00003 and F-2018-00010, *see* ¶ 45), and the week of February 11, 2019 (for an update on the number of documents to be reviewed, *see* ¶ 58).  The Department took months simply to intake and acknowledge requests. It ignored voicemails and emails, directed correspondence to unattended mailboxes or employees who were on extended leave, and forced Plaintiff both to engage OGIS and to threaten litigation just to start a dialogue.  The Department further delayed searching because of mold abatement, belated decisions to consult other agencies, and an unnecessary insistence on reclassifying old documents.  When Plaintiff observed that the Department's belated November productions omitted responsive records (and contained no records at all for some requests), the Department responded that searches were ongoing.  Yet months later, the Department has communicated no determination or production to remedy those gaps, and it does not appear that the Department even bothered to implement the targeted search criteria that Plaintiff supplied at the Department's request.  The time has come for judicial intervention.  The Department should

promptly complete its searches and produce records responsive to Plaintiff's long-outstanding

requests.

## IV.     The Department's Exemption Claims Are Overbroad with Respect to Two Requests

63.     The Department also violated its obligations under FOIA by making improper

redactions in response to Requests F-2017-17610 and F-2018-02824.[12]  Plaintiff limits its claims

in this suit to certain improper redactions to the 11 documents listed in the table below, each of

which was timely appealed and is now constructively exhausted.

| Document | Request Number | Determination Date | Appeal Date | Redaction |
|----------|---------------|-------------------|-------------|-----------|
| BAGHDAD 001100 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(6) |
| BAGHDAD 002040 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(6) |
| BAGHDAD 002591 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(6) |
| BAGHDAD 000366 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(1) |
| BAGHDAD 004690 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(1) |
| BAGHDAD 004058 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(1) |
| BAGHDAD 000981 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(1) |
| BAGHDAD 004527 | F-2017-17610 | 11/21/2018 | 02/11/2019 | (b)(1) |
| BAGHDAD 001870 | F-2017-17610 | 03/27/2019 | 04/04/2019 | (b)(1) |
| BAGHDAD 004164 | F-2018-02824 | 11/13/2018 | 02/11/2019 | (b)(6) |
| BASRAH 000029 | F-2018-02824 | 11/21/2018 | 02/11/2019 | (b)(1) |

### A.     Plaintiff Timely Appealed Redactions to Records Produced in Response to Requests F- 2017-17610 and F-2018-02824

64.     In response to Request F-2017-17610 (Ex. 1), the Department produced 16 total

documents, 12 of which were redacted:  four unredacted cables on November 15, 2018, 10

redacted cables on November 21, 2018, *see* Ex. 11 (11/21/18 Response);[13] and two more

---

[12] The Department also improperly redacted cables responsive to F-2018-00011, but Plaintiff does not bring a claim here with respect to those redactions.

[13] The 10 redacted cables produced on November 21, 2018 are: BAGHDAD 000366, BAGHDAD 004690, BAGHDAD 001100, BAGHDAD 004058 (produced as BAGHDAD 00069), BAGHDAD 002040, BAGHDAD 001978, BAGHDAD 000981, BAGHDAD 004351, BAGHDAD 004527, and BAGHDAD 002591.

redacted cables on March 27, 2019, *see* Ex. 12 (03/27/19 Response).[14]  In response to Request F-2018-02824, the Department produced five total documents, two of which were redacted:  one redacted cable on November 13, 2018, *see* Ex. 13 (11/13/18 Response);[15] and one redacted cable, along with three unredacted cables, on November 21, 2018, *see* Ex. 14 (11/21/18 Response).[16]

65.     The Department asserted that the redacted information is exempt either "pursuant to 5 U.S.C. § 552(b)(1), which protects information that is properly classified in the interest of national security pursuant to Executive Order 13526," or "5 U.S.C. § 552(b)(6), which concerns material the release of which would constitute a clearly unwarranted invasion of an individual's personal privacy."  *See* Exs. 11-14.  On the documents themselves, redactions pursuant to FOIA exemption (b)(1) are annotated, "B1," and "1.4(B)" or "1.4(D)," corresponding to the applicable classification category from Executive Order 13526.  *See* Order § 1.4 ("(b) foreign government information," and "(d) foreign relations or foreign activities of the United States, including confidential sources").  Redactions pursuant to FOIA exemption (b)(6) were annotated "B6." The Department provided no further justification or explanation for its redactions.

66.     The Department further informed Plaintiff that it could submit appeals by mail or fax, and that any appeal must be "postmarked within 90 calendar days of the date of this initial agency decision letter."  Exs. 11-14.

67.     On February 11, 2019, Plaintiff faxed an appeal challenging withholdings to the ten redacted cables produced on November 21, 2018 in response to F-2017-17610.  As noted in the table above, Plaintiff now challenges the redactions to only eight of these cables.

---

[14] The two redacted cables produced on March 27, 2019 are: BAGHDAD 001712 and BAGHDAD 001870.

[15] The redacted cable produced on November 13, 2018 is BAGHDAD 004164.

[16] The redacted cable produced on November 21, 2018 is BASRAH 000029.

68.     Also on February 11, 2019, Plaintiff faxed an appeal challenging withholdings to the two redacted documents produced on November 13 and November 21, 2018 in response to Request F-2018-02824.

69.     On April 4, 2019, Plaintiff faxed an appeal challenging withholdings to one of the two redacted documents produced on March 27, 2019 in response to Request F-2017-17610.

70.     All three appeals were submitted within 90 calendar days of the applicable agency decision letter, and all three explain in detail why the redactions are improper.

### B.     Plaintiff Has Exhausted Administrative Remedies

71.     Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), the Department had 20 working days to make a determination on Plaintiff's appeals.  This deadline has now expired for all three appeals.[17]

72.     Consistent with its overall lack of diligence (*see supra* Part III.C), the Department has not made a determination on any of the three appeals as of the date of this Complaint.  The Department has not asserted that unusual circumstances have prevented it from meeting FOIA's statutory deadline, nor has the Department requested an extension.

73.     Plaintiff has therefore exhausted administrative remedies concerning redactions to the 11 documents referenced in the table above.  *See* 5 U.S.C. § 552(a)(6)(C)(i).

---

[17] Plaintiff received a letter dated February 15, 2019 (and another nearly identical letter dated March 27, 2019), stating that the Department received Plaintiff's February 11 appeal regarding F-2018-02824.  Plaintiff received a similar letter dated March 27, 2019 stating that the Department received Plaintiff's February 11 appeal regarding F- 2017-17610.  And Plaintiff received a letter dated April 5, 2019 stating that the Department received Plaintiff's April 4 appeal regarding the Department's March 27 production in response to F-2017-17610.  None of these letters addressed any of the issues raised in Plaintiff's appeals.

C.     **The Department's Redactions Are Improper**

74.     Plaintiff has narrowed its challenges and through this Complaint seeks an order compelling release of only some of the redacted material in the 11 improperly redacted documents listed in the table above.  Each of these 11 documents appears to be publicly available on *WikiLeaks*.[18]  Comparing the unredacted *Wikileaks* versions of these 11 cables to the redacted versions produced by the Department confirms that many of the Department's (b)(1) and (b)(6) exemption claims are improper.

### 1.  The Department's Improper (b)(6) Withholdings

75.     The Department improperly redacted three cables in response to F-2017-17610 and one cable in response to F-2018-02824 under FOIA exemption (b)(6) (personal privacy).  The redacted versions of these four cables as produced to Plaintiff are attached here as Exhibits 15 through 18.[19]  All of the redactions in Exhibits 15 through 18 should be removed.[20]

76.     Many of the Department's redactions are improper because they do not conceal information about any individual and thus are not protecting any "*personal* privacy" interest in a "personnel[,] medical . . . or similar file[]."  5 U.S.C. § 552(b)(6) (emphasis added).  For example, the Department redacted unspecified references to broad groups of people — such as

---

[18] Despite public availability, Plaintiff challenges the redactions so that it can obtain what the Department deems official, authentic records.

[19] The three redacted documents responsive to F-2017-17610 for which Plaintiff challenges (b)(6) redactions in this Complaint are BAGHDAD 001100 (Ex. 15), 002040 (Ex. 16), and 002591 (Ex. 17), and the document responsive to F-2018-02824 is BAGHDAD 004164 (Ex. 18). The Department redacted a phone number from BAGHDAD 001978 and information concerning individuals' involvement in women's health initiatives in Sadr City from BAGHDAD 001712 (both responsive to F-2017-17610).  Plaintiff does not challenge redactions to these documents.

[20] All allegations concerning the contents of redacted material in Part IV.C.1-2 are based on *WikiLeaks* versions of the cables.  Plaintiff stands ready to provide copies of the *WikiLeaks* cables to the Court, with highlighting to show materials the Department redacted, either under seal or on the public docket, as directed.

"several technical officials at the Amanat,"[21] "REO Hillah contacts,"[22] and Shi'a "leaders"[23] — none of whom was named or individually identifiable.  All such redactions should be removed.

77.     To the extent individuals are named, the redacted documents reflect government business, not personal information about the named individuals, and thus are not the type of files subject to protection under (b)(6).  For the same reason, the redactions of government officials' names from discussions about their official government functions do not protect a significant personal privacy interest covered by (b)(6).  The redactions conceal the names of individuals who engaged in conversations with U.S. officials about issues of public importance and affairs of state.  Disclosure would reveal those individuals' comments on these issues but would not reveal information related to the individuals' personal background (marital status, place of birth, etc.) or any other personal or intimate information (medical history, performance reviews, etc.).

78.     For example, one set of redactions conceals the name and title of a leader in the Iraqi Council of Representatives (the equivalent to the U.S. Congress) who expressed views that Muqtada al-Sadr's movement founded Jaysh al-Mahdi in part because its members were "inclined to violence."[24]  Another redaction conceals the name and title of a governor and former militia commander who expressed his belief that Muqtada al-Sadr's political party was "expanding [its] influence over politics in Baghdad."[25]  And another redaction conceals the name and public title of a former governor and current representative to the United Nations Assistance

---

[21] *Compare* Ex. 16, *with* http://wikileaks.org/plusd/cables/07BAGHDAD2040_a.html, § 18.

[22] *Compare* Ex. 17, *with* http://wikileaks.org/plusd/cables/06BAGHDAD2591_a.html, § 6.

[23] *Compare* Ex. 18, *with* http://wikileaks.org/plusd/cables/06BAGHDAD4164_a.html, § 9.

[24] *See* Ex. 18 § 5 (noting "the violent beginning of the Sadrist movement"); *id.*  § 6 (noting that "[e]lements of the JAM are uncontrollable").  *Compare* Ex. 18, *with* http://wikileaks.org/plusd/cables/06BAGHDAD4164_a.html.

[25] *Compare* Ex. 16, *with* http://wikileaks.org/plusd/cables/07BAGHDAD2040_a.html, § 16.

Mission for Iraq who reported his belief that "Imam Karbala'i became convinced the shrines had to act to help stem sectarian violence in Iraq."[26]  Such redactions are the equivalent of redacting the name of a U.S. Senator from a discussion of American public policy issues.  None of this information is the type of personal, private information protectable under (b)(6), and all such redactions should be removed.

79.    Notably, the Department does not contend that the (b)(6)-redacted information should be withheld as classified under FOIA exemption (b)(1) and Executive Order 13526, § 1.4(d) (concerning classification of documents pertaining to "foreign relations or foreign activities of the United States, *including confidential sources*") (emphasis added), or FOIA exemption (b)(7)(D) (concerning "confidential source[s]" disclosed in records "compiled for law enforcement purposes").  Thus, there is no reason to believe the purported personal privacy interest arises from a desire to protect confidential foreign and/or law enforcement sources, and there is no other discernable privacy issue on the face of the documents.

80.    There is also a significant public interest in disclosure.  The identities of sources of information the Department has redacted are relevant to Plaintiff's overall investigation into terrorist financing in Iraq, as well as the U.S. government's responses to corruption and terrorism in Iraq.  Plaintiff represents 1,200 individuals with intense interests in this information, as they or their loved ones were killed or injured by terrorists in Iraq who received corrupt financing through channels discussed by the Department's documents.  Notably, the Department's recent press conference, in which it revealed that declassified records show Iran was responsible for at least 608 American service member deaths in Iraq between 2003 and 2011, shows that the

---

[26] *Compare* Ex. 15, *with* http://wikileaks.org/plusd/cables/09BAGHDAD1100_a.html, § 5.

Department recognizes the public is interested in learning the truth about who is to blame for attacks on Americans serving their country in Iraq.[27]

81.     Further, any protectable privacy interest that might have existed has already been lost and would not be harmed by release to Plaintiff here.  The names and information redacted from Exhibits 15 through 18 are available for anyone to see on a widely known website.  It is implausible that release of this information to Plaintiff or on the Department's website would reveal information that is still meaningfully private.  There is therefore no discernable benefit to the individuals whose privacy the Department claims to protect.[28]

## 2.  The Department's Improper (b)(1) Withholdings

82.     The Department improperly redacted six cables in response to F-2017-17610 and one cable in response to F-2018-02824 under FOIA exemption (b)(1) (classified material).[29]  The redacted versions of these seven cables, as produced to Plaintiff, are attached here as Exhibits 19 through 25.  The redactions specified below should be removed.

83.     FOIA permits withholding under (b)(1) only if a document is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of

---

[27] *See* U.S. Department of State Press Briefing, Diplomacy in Action (Apr. 2, 2019), *available at* https://www.state.gov/r/pa/prs/dpb/2019/04/290841.htm.

[28] For Plaintiff and its clients, by contrast, disclosure by the Department is independently valuable to more easily authenticate the documents (Plaintiff is not suggesting that *WikiLeaks* documents cannot be authenticated).  Regardless whether *WikiLeaks* disclosure categorically waives (b)(6) exemption claims, prior disclosure and wide availability in the public domain significantly lessens the privacy interest at stake for purposes of balancing interests under exemption (b)(6).  And here, the Department's release of already-public information will not present any unique harm, reducing any conceivable privacy interest that might have existed.

[29] The improperly redacted documents responsive to F-2017-17610 are BAGHDAD 000366 (Ex. 19), 004690 (Ex. 20), 004058 (Ex. 21), 000981 (Ex. 22), 004527 (Ex. 23), and 001870 (Ex. 24), and the document responsive to F-2018-02824 is BASRAH 000029 (Ex. 25).  The Department also made (b)(1) redactions to BAGHDAD 004351 (responsive to F-2017-17610), but Plaintiff does not challenge redactions to that document.

national defense or foreign policy" and is "in fact *properly* classified pursuant to such Executive

order." 5 U.S.C. § 552(b)(1)(A) (emphasis added).  Under Executive Order 13526, classification

is only permissible where, among other things, "the unauthorized disclosure of the information

*reasonably could be expected to result in damage to the national security* . . . and the original

classification authority is able to identify or describe the damage," Executive Order § 1.1(a)(4)

(emphasis added), and the information pertains to one of eight subjects including, as relevant

here, "(b) foreign government information;" or "(d) foreign relations or foreign activities of the

United States, including confidential sources," *Id.* § 1.4(b), (d).  "If there is significant doubt

about the need to classify information, it shall not be classified."  *Id.*  § 1.1(b).

84.      As a threshold matter, this exemption cannot be validly invoked to withhold

information that has already been officially released, and here, much of the specific redacted

material was previously released by the Department or other government agencies.  For the

remaining redacted material, to be exempt under FOIA, the Department must be able to identify

and describe damage to national security that "reasonably could be expected" from release of the

information.  The Department has never identified or described any such damage, either when it

initially produced the redacted documents or in response to Plaintiff's appeals.  And there is no

apparent basis on which the Department could credibly do so.  Beyond the material that has been

officially released, the other material is publicly available, significantly lessening any

conceivable damage to national security.  Moreover, the information is stale and manifestly

innocuous.  The following paragraphs challenge specific redactions and explain why the

information does not qualify for classification.

85.      BAGHDAD 000366 (Ex. 19) was written in 2010 and was set for declassification

on February 10, 2019 but was reclassified by the Department, apparently in response to

Plaintiff's FOIA request, on October 22, 2018.  Though the Department made redactions to five sections of this document (sections 2, 3, 7, 8, and 9), Plaintiff challenges only redactions to the first and last sentence of section 8.

86.    The first sentence, which is redacted in full, states that "ACCO[30] staff also met with the Prime Minister's anti-corruption advisor, Dr. Adel Mohsen, who also serves as the Health Ministry IG."[31]  A routine meeting between Department anti-corruption staff in Iraq and an Iraqi anti-corruption official is an unremarkable event, and given that it occurred more than nine years ago, officially acknowledging that meeting does not plausibly pose any risk to national security.  Acknowledging the only other information in the sentence — the equally open fact that Dr. Adil Muhsin (also spelled Adel Mohsen in certain sources) held two positions in the Iraqi government, as the Iraqi Prime Minister's anti-corruption advisor and the Health Ministry IG[32] — likewise poses no conceivable risk to national security.  Withholding this information was unnecessary, as evidenced by the fact that similar information was released by the Department in a different cable.  *See* Ex. 21 § 8 (unredacted reference to "Dr. Adil Muhsin" "in the position of the Prime Minister's Advisor for Anti-Corruption").  This sentence should be disclosed in full.

87.    The final sentence of section 8 in Exhibit 19, which is also improperly redacted in full, is a "COMMENT" stating that "Mohsen himself has been the subject of credible corruption allegations in the past, *e.g.,* in connection with the Health Ministry's procurement of

---

[30] "ACCO" refers to the State Department's Anti-Corruption Coordination Office.

[31] *Compare* Ex. 19, *with* http://wikileaks.org/plusd/cables/10BAGHDAD366_a.html, § 8.

[32] Glanz, James and Mohammed, Riyadh, *Premier of Iraq Is Quietly Firing Fraud Monitors,* N.Y. Times (Nov. 17, 2008) (referring to "Adel Muhsin, Mr. Maliki's coordinator of anticorruption organizations and himself the inspector general at the Health Ministry").

pharmaceuticals."[33]  The Department elsewhere *has* officially acknowledged that very same fact in an unredacted cable from 2008.  *See* Ex. 21 § 8 ("The fact alone that Maliki would maintain Dr. Adil Muhsin, *who is widely reputed for his own brazen acts of corruption*, in the position of the Prime Minister's Advisor for Anti-Corruption speaks to how seriously senior government officials take the issue.").  The Department has thus waived any valid exemption claim.  In any event, it is illogical to conclude that acknowledging stale, "widely reputed," allegations of corruption in Iraq could reasonably be expected to damage national security now.  *See* Ex. 21.  The sentence should be released in full.

88.    BAGHDAD 004690 (Ex. 20) was written in 2006 and was set for declassification on December 19, 2016, but the classification was extended on May 13, 2013.  Though the Department made redactions to eight sections of this document (sections 2, 3, 4, 5, 6, 7, 9, and 10), Plaintiff challenges redactions to the last two sentences of section 6 only.

89.    The penultimate sentence, which was redacted in full, reads: "When pressed on the issue, Dr. Yassin said that he was open to removing this requirement, but suggested that U.S. companies could also 'donate' medical equipment and other supplies to Iraq."[34]  There is no logical basis for redacting this sentence.  Unredacted portions of the cable describe Dr. Yassin and his position — he was the Director General of Kimadia — and reveal that he met with Department officials, such that the Department has waived any exemptions based on this information.  *See* Ex. 20 § 6 (first sentence).  Acknowledging that, more than 12 years ago, "Dr. Yassin . . . suggested that U.S. companies could also 'donate' medical equipment and other supplies to Iraq," could not reasonably be expected to damage national security, particularly

---

[33] *Compare* Ex. 19, *with* http://wikileaks.org/plusd/cables/10BAGHDAD366_a.html, § 8.

[34] *Compare* Ex. 20, *with* http://wikileaks.org/plusd/cables/06BAGHDAD4690_a.html, § 6.

because Dr. Yassin was removed from his role shortly after making that suggestion, such that there is no apparent ongoing relationship between him and the U.S. government.[35]  By contrast, the sentence is important to Plaintiff because it indicates a request by the Director General of Kimadia for U.S. companies to make corrupt payments — for which Dr. Yassin used the euphemism "donate" — to Ministry officials.  Such information supports Plaintiff's clients' claims and serves the public interest in understanding public corruption in Iraq.  This sentence should be released.

90.     The final sentence of section 6 in Exhibit 20, which was also redacted in full, reads:  "Dr. Yassin was 'dismissed' by the Minister of Health October 30 [2006] and replaced with a Sadrist DG, Dr. Ammar."[36]  Acknowledging (more than a decade after the fact) the transition from one Director General to the next of an Iraqi state-owned entity, and of the affiliation of the incoming Director General with the Sadrist movement, all of which are political (and thus inherently public) facts, cannot plausibly be expected to damage national security.  Indeed, the Department waived any redaction claim by acknowledging through an unredacted portion of another cable that "the Ministry of Health [is] infiltrated by Sadrists."  *See* Ex. 23 § 8 (unredacted: "Barzani characterized the Ministry of Health, infiltrated by Sadrists, as the 'Ministry of Weapons Transportation.'").  This sentence concerning personnel changes and political affiliations concerning high-profile public positions should be released.

91.     BAGHDAD 004058 (Ex. 21) was written in 2008 and was set for declassification on December 29, 2018, but the Department extended its classification on October 22, 2018, apparently in response to Plaintiff's FOIA request.  Though the Department made redactions to

---

[35] *See* http://wikileaks.org/plusd/cables/06BAGHDAD4690_a.html, § 6 (last sentence).

[36] *Compare* Ex. 20, *with* http://wikileaks.org/plusd/cables/06BAGHDAD4690_a.html, § 6.

four sections of this document (sections 2, 3, 5, and 6), Plaintiff challenges certain redactions in

section 6 only.  *See* Ex. 21.  Section 6 concerns statements made by the chief judge of the Iraqi

Commission on Integrity, Raheem (or Rahim) al-Ugailee, and by the chief of the Iraqi Board of

Supreme Audit, Dr. Abdulbasit Turki,[37] concerning corruption in Iraq.[38]

92.     The Department improperly redacted the following passage, which begins in the

fourth sentence: "Raheem and Abdulbasit were surprisingly candid about the allegations of

corruption against the Health Ministry IG and advisor to the Prime Minister for anti-corruption,

Dr. Adil Muhsin.  Abdulbasit described an investigation into Muhsin's profits from a USD 10

million electrocardiogram machine contract.  The file, he said, was mysteriously 'lost' before

Muhsin could be prosecuted."[39]

93.     As noted with respect to Exhibit 26, Dr. Adil Muhsin's role as the Health Ministry

IG and advisor for anti-corruption is public knowledge and, in any event, is disclosed in an

unredacted portion of Exhibit 21 itself.  *See* Ex. 21 § 8 (unredacted reference to Dr. Adil Muhsin

as the Prime Minister's Advisor for Anti-Corruption).  Similarly, it is public information, fully

acknowledged by the Department, that Dr. Muhsin was accused of corruption.  *See* Ex. 21 § 8

(unredacted: "The fact alone that Maliki would maintain Dr. Adil Muhsin, who is widely reputed

for his own brazen acts of corruption, in the position of the Prime Minister's Advisor for Anti-

Corruption speaks to how seriously senior government officials take the issue.").  The

unredacted statement just quoted from Exhibit 21 also shows that the Department has publicly

---

[37] Dr. Abdulbasit's role as an anti-corruption official in Iraq is public knowledge.  *See*, *e.g.*, https://www.reuters.com/article/uk-iraq-centralbank/iraq-ousts-central-bank-chief-over-corruption-probe-idUKBRE89F1OU20121016.

[38] *See* Ex. 21; *see also* http://wikileaks.org/plusd/cables/08BAGHDAD4058_a.html, §§ 1, 5, and 6.

[39] *Compare* Ex. 21, *with* http://wikileaks.org/plusd/cables/08BAGHDAD4058_a.html, § 6.

33

acknowledged Dr. Muhsin's role as anti-corruption advisor to the Prime Minister, such that the Department has waived its ability to withhold the same information.  Further, the public availability of this information undermines the Department's ability to credibly contend that there is a national-security risk from acknowledging the same link again.  And disclosing the link between Dr. Muhsin and a particular medical contract — and the apparent destruction of documents before a prosecution could be brought — does not plausibly harm national security.  On the contrary:  its release would further contribute to the public's understanding of Iraqi public corruption and the pattern — confirmed by the Department's other releases — of Ministry officials destroying evidence.  *See*, *e.g.* Ex. 24 § 4 (unredacted Department cable stating: "Muhsin's statement follows a fire last month at the Ministry's headq[u]arters that destroyed numerous documents related to KIMADIA contracts; authorities are investigating allegations that the fire was deliberately set to destroy evidence of corruption.").

94.     Moreover, the Department has acknowledged in unredacted portions of the cable that Iraqi anti-corruption officials (such as Raheem) "have shown a newfound outspokenness this year," Ex. 21 § 6, suggesting that statements they made to the Department were never intended to be withheld from the public.  It is illogical to conclude that acknowledging a specific example of Dr. Muhsin's corruption (which the Department already generally acknowledged) from a source that was publicly open about such issues could reasonably be expected to damage national security now.  The redacted material quoted in the preceding paragraph should be released.

95.     BAGHDAD 000981 (Ex. 22) was written in 2006 and was declassified on March 22, 2016, but, on November 21, 2018, more than two and a half years after being declassified, the Department reclassified the document, apparently in response to Plaintiff's FOIA request. The Department improperly redacted all of section 9, which states:

Although by the end of the meeting Ja'afari had agreed to permit the formulation
of a plan to deal with militia-inflicted violence, he was clearly not anxious to do
so.  Given that his future as Prime Minister is dependent on the support of
Moqtada al-Sadr, he is clearly skittish about doing anything that will offend his
new political benefactor.  Approving any plan to confront and defang the JAM
[Jaysh al-Mahdi] will do just that.  Al-Anzi meanwhile sought to support Ja'afari
with a clearly sectarian agenda.  Rubaie, who is usually not shy about speaking up
in these meetings, sat silently throughout except to question once how GEN
Casey concluded the evidence presented pointed to JAM.  Dulime clearly went on
record, yet again, to say that the JAM is a major threat and gamely tried to defend
the effectiveness of his forces that he himself admitted are not acting against
militias.  While all parties seem willing to acknowledge for the sake of political
correctness that militias must be controlled, finding the political will to actually
take action will prove to be quite challenging.[40]

96.     The political issues and challenges facing Iraq — including Jaysh al-Mahdi's

violence, the link between Jaysh al-Mahdi and Moqtada al-Sadr, and the difficulty of dealing

with sectarian violence — have been well documented in the public and in other documents the

Department has released.  *See* Ex. 23 § 8 (unredacted: "[Barzani] called for crushing those who

resort to violent means such as attacking police stations.  He underscored that he was not just

speaking of Al Qaeda, but also the militias.  Barzani characterized the Ministry of Health,

infiltrated by Sadrists, as the 'Ministry of Weapons Transportation.'").  Thus, the Department

has waived its ability to withhold this information.  Further, the transitional government in place

at the time of this cable no longer exists, and Ja'afari stepped down from his most recent

government position in 2018.  It is therefore not plausible that acknowledging this already-public

information from 2006 could reasonably be expected to damage national security now —

perhaps explaining why classification was allowed to lapse in the first place several years ago.

Section 9 should be released in full.

---

[40] *Compare* Ex. 22, *with* http://wikileaks.org/plusd/cables/06BAGHDAD981_a.html, § 9.

97.     BAGHDAD 004527 (Ex. 23) was written in 2006 and was declassified on

December 11, 2016, but the Department reclassified the document on November 21, 2018,

apparently in response to Plaintiff's FOIA request.  Though the Department made redactions to

five sections of this document (sections 1, 2, 3, 7, and 8), Plaintiff challenges only redactions in

section 8 to the following sentence:  "Maliki replied that when he appoints a new Minister of

Health first he would first [sic] send in the army to cleanse the ministry of corruption."[41]

98.     The Department has already released the fact that "the Ministry of Health [was]

infiltrated by Sadrists" and was referred to "as the 'Ministry of Weapons Transportation,'" Ex.

23 § 8 (unredacted sentence immediately preceding the redaction at issue), as well as the fact that

"the political parties that effectively hold sway over individual ministries more often than not

view their ministries as their party's personal piggy bank.  (This phenomenon was most

dangerous when militias held sway over parts of certain ministries, such as the Ministry of

Health.)," Ex. 21 § 8.  Thus, the Department has waived its ability to withhold the same

information, including information that the Ministry needed to be cleansed of corruption in 2006

and that the army might have been needed to accomplish that goal (because of the militia control

of the Ministry's security services).

99.     Further, a new Minister of Health has been appointed since Prime Minister Maliki

made this statement in 2006, and Maliki is no longer Prime Minister with appointment power.

Thus, the Department cannot credibly claim that it redacted this sentence to avoid revealing a

potential military operation, as the triggering events for that operation occurred long ago.  A

statement 13 years ago by a Prime Minister who no longer holds office, about a corrupt Ministry

---

[41] *Compare* Ex. 23, *with* http://wikileaks.org/plusd/cables/06BAGHDAD4527_a.html, § 8.

over which he no longer holds power, does not plausibly endanger national security.
Accordingly, the redacted sentence should be released in full.

100.     BAGHDAD 001870 (Ex. 24) was written in 2009 and was set for declassification
on July 9, 2019, but the Department extended its classification on February 11, 2019, apparently
in response to Plaintiff's FOIA request.  Plaintiff challenges redactions to the following two
sentences from section 4:  "Muhsin himself has long faced corruption allegations—among them,
accepting kickbacks for procurement contracts—although he has so far avoided prosecution due
to his close personal ties to Prime Minister Al-Maliki.  Muhsin recently requested USG
assistance in reforming the KIMADIA operation, but his plan to direct personally the project
renders it a non-starter, given his tainted reputation.  END COMMENT."[42]

101.     As noted above, widespread suspicions that Dr. Adel Mohsen (Adil Muhsin) was
corrupt is public information and has already been revealed by other records the Department has
released.  *See*, *e.g.*, Ex. 21 § 8 (unredacted reference to Muhsin's "brazen acts of corruption").
This information released by the Department also shows that Muhsin had a "tainted reputation."
Thus, the Department waived its ability to redact the same information from Exhibit 24.

102.     Indeed, other agencies have also released the same information.  For example,
CENTCOM released a February 19, 2008 document identifying "the main bad actor" within "the
Health Ministry" as "the IG" — a clear reference to Muhsin, the Health Ministry's IG at the
time[43] — and stating that he "was as corrupt as could be."  Ex. 26 (Embassy Annex (Feb. 19,
2008)).  Thus, disclosing the second redacted sentence in section 4 of Exhibit 24, which reflects

---

[42] *Compare* Ex. 24, *with* http://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html, § 4.

[43] Glanz, James and Mohammed, Riyadh, *Premier of Iraq Is Quietly Firing Fraud Monitors*,
N.Y. Times (Nov. 17, 2008) (referring to "Adel Muhsin, Mr. Maliki's coordinator of
anticorruption organizations and himself the inspector general at the Health Ministry").

the U.S. government's sensible opposition to placing a corrupt official like Muhsin in charge of efforts to reform a corrupt organization like Kimadia, does not pose any conceivable threat to national security.

103.    While the entire passage should be released, to the extent the Department is able to describe a reasonably likely national-security threat from release of some portions of the passage, other portions could easily be segregated and released.  For example, by redacting the clause referencing Muhsin's possible ties to "Prime Minister Al-Maliki," the second sentence could be released, as it would reveal nothing more than that the U.S. government rebuffed the request of a known corrupt official to assume control of efforts to reform Kimadia.

104.    Plaintiff also challenges the following redactions from section 2 of BAGHDAD 001870 (Ex. 24):

> Al-Maliki's comments were indicative of his ongoing skirmishing with the COR over the corruption dossier (see ref A for background).  The COR's subjecting now-resigned Trade Minister Abdel Falah Al-Sudani to tough questioning in May over corruption allegations and threatening similarly to grill other Ministers clearly rankled Al-Maliki.  Amidst Al-Maliki's threat to retaliate by revealing corruption within the COR, the latter has so far refrained from subjecting other cabinet members appearing before it (most recently, Oil Minister Shahristani) to the tough questioning over corruption endured by the former Trade Minister.  The Prime Minister's comments were also noteworthy for his reference to corruption within the judiciary, as public allegations of abuses by judges are rare.  While knowledgeable sources assert that Iraq's judiciary is far from immune to corruption, our contacts within the judiciary steadfastly — and proudly — maintain that there are no documented cases in recent years of wrongdoing by judges.  They further assert that Iraq's respected senior judge, Medhat Mahmoud, responsible for supervision of the country's judicial corps in his capacity as head of Iraq's High Judicial Council, ensures that judges adhere to his own impeccable standards of honesty.[44]

105.    This is an 11-year-old statement concerning a Prime Minister who no longer holds office, a long-resigned minister suspected of corruption, alleged but disputed allegations of

---

[44] *Compare* Ex. 24, *with* http://wikileaks.org/plusd/cables/09BAGHDAD1870_a.html, § 2.

corruption among the judiciary, and a well-respected judge.  Statements concerning former public officials cannot create a credible danger to national security now.  Nor can unsurprising statements that alleged corruption might be investigated or that a Prime Minister might have attempted to protect his ministers from public cross-examination.  Notably, nothing in this statement reveals any sources, and it does little more than reveal that corruption was a contentious issue in Iraq in 2008 — the kind of publicly available information that cannot plausibly harm U.S. national security interests more than a decade later.  Accordingly, the redacted paragraph should be released in full.

106.     BASRAH 000029 (Ex. 25) was written in 2008 and was declassified on April 14, 2018, but the Department reclassified the document on November 21, 2018, apparently in response to Plaintiff's FOIA request.  The cable concerns the kidnapping and release of CBS reporter and British citizen Richard Butler, and it was written on the day of his release.  *See* Ex. 25.  The Department redacted a total of seven sentences, of which Plaintiff challenges four (two in section 2 and two in section 3).

107.     Each of the four sentences was improperly redacted because the redacted information was not only widely reported at the time the cable was written but also has been acknowledged officially by the U.S. government in ways that corroborate (and indeed rely upon) initial public reporting.  Thus, any ability to withhold the information has been waived, and, in any event, given that the information has been known to the public so widely and for so long, its release now cannot conceivably endanger national security interests.

108.     The first improperly redacted sentence in section 2 states: "Sadrist leaders consistently denied any Jaysh al-Mahdi (JAM) involvement, but a JAM Special Group (SG) has

been suspected."[45]  The government officially acknowledged this fact in January 2019 in the

U.S. Army War College's comprehensive study of the Iraq war, which states:  "On February 11,

2008, CBS reporter Richard Butler was kidnapped from his hotel by JAM members wearing

police uniforms."[46]  These details were in fact publicly known at the time the cable was written

and thus have been disclosed for more than eleven years.  For example, the Army War College

cited an April 14, 2008 new article, and the *New York Times* reported as follows that same day:

"Some security officials had suggested that Sadr's group, while negotiating with the kidnappers,

had also been involved in the kidnapping."[47]  Any exemption claims have been waived by this

widespread and officially acknowledged disclosure.

109.    The next improperly redacted sentence in section 2 states:  "Although Sadrists

announced February 13 that both hostages would be released that day, only the interpreter was

released."[48]  A nearly verbatim statement was reported in *The Guardian* on April 15, 2008:

"[T]he office of Shia cleric Moqtada al-Sadr said it would quickly secure Butler's release, but

only the interpreter was set free."[49]  The *New York Times* similarly reported:  "The interpreter was

released Feb. 13 after negotiations between the kidnappers and representatives of the Shiite cleric

Moktada Al-Sadr." [50]  The Department has not explained (and cannot explain) how the

---

[45] *Compare* Ex. 25, *with* http://wikileaks.org/plusd/cables/08BASRAH29_a.html, § 2.

[46] U.S. Army War C. Press, The U.S. Army in the Iraq War — Vol. 2:  Surge and Withdrawal at 355 (2007-2011) (citing *Iraqi Soldiers Free CBS Journalist from Captors*, CNN (Apr. 14, 2008)).

[47] Goode, E. and Kamber, M., *British Journalist, Kidnapped in February, Freed in Iraq*, N.Y. Times (Apr. 14, 2008).

[48] *Compare* Ex. 25, *with* http://wikileaks.org/plusd/cables/08BASRAH29_a.html, § 2.

[49] Glendenning, L., *Thank You – I'm Looking Forward to Seeing My Family*, The Guardian (Apr. 15, 2008).

[50] Goode, E. and Kamber, M., *British Journalist, Kidnapped in February, Freed in Iraq*, N.Y. Times (Apr. 14, 2008).

confirmation in a diplomatic cable of such widely-reported information would threaten any meaningful national-security interest, particularly where the U.S. government has relied upon similar public reporting about the same incident.

110.    In section 3, the Department redacted the following two-sentence summary of the military operation that freed Mr. Butler:  "Elements of the IA [Iraqi Army] 14th Division met armed resistance from a small group of JAM or JAM-SG in the Jubaylah district of Basrah City. The IA overpowered the group, who then surrendered; the group pointed out the nearby home of their cell leader."[51]  The next sentence, which is unredacted, reads, "The IA entered that house and found Butler inside."  Ex. 25.  There is no basis for this redaction, and the exemption claim has been waived, as even more detailed information was published by the Army War College earlier this year:  "[O]n April 14, soldiers from the 14th Iraqi Army Division's 51st Brigade engaged a JAM cell firing from a house in the Jubailah District and discovered the kidnapped CBS journalist Richard Butler inside."[52]  Moreover, the same information has been in the public domain for more than a decade, as the *New York Times* also reported on April 15, 2008, that "the Army received a tip that the journalist was hidden in a house in the area."[53]

111.    Releasing the four challenged sentences broadly describing operations that happened more than ten years ago would not plausibly damage national security now, even if they were not already public and exemption claims were not waived.  All four sentences should be released in full.

---

[51] *Compare* Ex. 25, *with* http://wikileaks.org/plusd/cables/08BASRAH29_a.html, § 3.

[52] U.S. Army War C. Press, The U.S. Army in the Iraq War — Vol. 2:  Surge and Withdrawal at 366 (2007-2011) (citing *Iraqi Soldiers Free CBS Journalist from Captors*, CNN (Apr. 14, 2008)).

[53] Goode, E. and Mizher, Q., *Two Journalists Are Released in Iraq*, N.Y. Times (Apr. 15, 2008).

## CLAIMS FOR RELIEF

### Count I:  Failure to Provide a Determination

112.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.    Plaintiff properly requested records within the possession, custody, and control of the Department.

114.    The Department is an agency subject to FOIA.

115.    The Department was required under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Plaintiff's FOIA requests.

116.    The time under 5 U.S.C. § 552(a)(6) for the Department to conduct such a search and to make a determination as to each of Plaintiff's FOIA requests, informing Plaintiff which documents the Department intends to produce and withhold, and the reasons for withholding any documents, has expired.  To the extent not yet completed, the Department has wrongfully failed to conduct an adequate search.

117.    The Department has wrongfully failed to make and communicate to Plaintiff a determination regarding Requests F-2018-00003, F-2018-00010, F-2019-01492, F-2019-03694, and F-2019-04415.  The Department has also wrongfully failed to make a determination and communicate to Plaintiff a determination regarding documents related to the House Oversight Committee's 2007 investigation into Iraqi corruption and ProCare Services's report on Kimadia, referenced in F-2018-00011.

118.    Pursuant to 5 U.S.C. § 552(a)(3)(A), the Department was required to produce promptly all responsive records that are subject to disclosure under FOIA.

119.    The Department has wrongfully failed to make such a production.

120.     Plaintiff has exhausted administrative remedies pursuant to 5 U.S.C.

§ 552(a)(6)(C)(i).

121.     Plaintiff is entitled to an order compelling the Department to conduct reasonable

searches sufficient to locate responsive records and to produce promptly all responsive records,

subject to withholdings agreed to by the parties or approved by the Court.

122.     To facilitate evaluation of the Department's search efforts, the Department should

be ordered to describe those efforts to Plaintiff.

123.     To facilitate determination of the validity of any withholdings, the Department

should be ordered to produce indexes justifying redactions to or withholding of any responsive

records.

### Count II:  Wrongful Withholding and Failure to Provide Reasonably Segregable Portions of Any Lawfully Exempt Records

124.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

125.     The Department has wrongfully withheld records responsive to Requests F-2017-

17610 and F-2018-02824 by redacting information that is not exempt under 5 U.S.C. § 552(b).

126.     Plaintiff has a statutory right under 5 U.S.C. § 552(b) to any reasonably

segregable portion of a record that contains exempt information.  The redactions Plaintiff

specifically challenges in Part IV above are reasonably segregable from any exempt material.

127.     Plaintiff timely appealed the Department's improper redactions and has now

exhausted administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

128.     Plaintiff is therefore entitled to an order compelling the Department to reproduce

responsive records without improper redactions.

## Count III:  Declaration Precluding Assessment of Fees

129.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    The Department has failed to comply with time limits under 5 U.S.C. § 552(a)(6).

131.    The Department did not provide timely written notice to Plaintiff of any unusual circumstances.

132.    No court has determined that exceptional circumstances exist.

133.    Accordingly, Plaintiff is entitled to a declaration that the agency may not assess any search fees associated with Plaintiff's requests, pursuant to 5 U.S.C. § 552(a)(4)(A)(viii) and 28 U.S.C. § 2201(a).

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

a.    Order the Department to promptly conduct a reasonable search for all records responsive to Plaintiff's FOIA requests, to the extent such a search has not already been conducted, and to demonstrate that it employed search methods reasonably likely to lead to the discovery of responsive records;

b.    Order the Department to produce within twenty days or such other time as the Court deems proper all records responsive to Plaintiff's FOIA requests that are subject to disclosure under FOIA, as agreed to by the parties or determined by the Court, and indexes justifying any withholdings or redactions;

c.    Order the Department to reproduce within twenty days or such other time as the Court deems proper records without the improper redactions identified above;

d.    Declare that the Department failed to comply with the time limits under 5 U.S.C. § 552(a)(6) and that search fees therefore may not be assessed under 5 U.S.C. § 552(a)(4)(A)(viii);

e.    Award Plaintiff attorney's fees and costs incurred in relation to this case, pursuant to 5 U.S.C. § 552(a)(4)(E); and

f.    Grant Plaintiff any other relief the Court deems just and proper.

Dated:  May 8, 2019

Respectfully submitted,

*/s/ Joshua D. Branson*

Ryan R. Sparacino (D.C. Bar No. 493700)
Sparacino PLLC
1920 L Street, N.W., Suite 535
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com

Joshua D. Branson (D.C. Bar No. 981623)
Andrew E. Goldsmith (D.C. Bar No. 1007074)
Matthew M. Duffy (D.C. Bar No. 1031257)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
mduffy@kellogghansen.com

*Counsel for Plaintiff*